# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORBERTO PEETS, <br><br>            Plaintiff, <br><br>     v. <br><br> CITY OF NEW YORK; CLAUDE STATEN; WILLIAM FULLAM; JOSEPH NEALON; BRENDAN DOWLING; RICHARD VOLPE; MARIO EROTOKRITOU; WAYNE ONESCHUK; JOHN CREEGAN; FELIX R. VIGO; FRANCIS TEGANO; MICHAEL LYNOTT; WILLIAM SHANAHAN; ANTHONY TOTA; SAMUEL ROMAN; GERALD ST. CLAIR; DONALD GANNON; THOMAS MCTERNAN; GEORGE MILIAN; ANTHONY ROSATO; WALTER VOSS; STEPHEN GEARY; JOSE COLON; AND JOHN AND JANE DOE POLICE OFFICERS 1-10, <br><br>            Defendants. | **COMPLAINT** <br><br> Jury Trial Demanded <br><br> 23 CV 6962 |

"Liberty is absolute and the loss of it irreplaceable."[1]

---

[1] *Baba-Ali v. State*, 878 N.Y.S.2d 555, 564 (Ct. Cl. 2009) (internal quotation marks and citation omitted).

Plaintiff Norberto Peets, by and through his attorneys, the law firm of Elefterakis, Elefterakis & Panek, alleges as follows:

<u>INTRODUCTION</u>

1.  Plaintiff Norberto Peets spent half his life – nearly 26 years – incarcerated for a crime he did not commit.

2.  This injustice was no accident but resulted from intentional misconduct perpetrated by the individual defendants and enabled by municipal policies.

<u>NATURE OF THE ACTION</u>

3.  This is an action to recover money damages arising out of the violation of plaintiff's rights.

<u>JURISDICTION AND VENUE</u>

4.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and the laws of the City and State of New York.

5.  The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and 1367(a).

6.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

<u>NOTICE OF CLAIM</u>

7.  Within ninety days after the claim alleged in this complaint arose, a written notice of claim was served upon defendants at the Comptroller's Office.

8.  At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

9.  This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

## JURY DEMAND

10. Plaintiff demands a trial by jury in this action.

## PARTIES

11. Plaintiff Norberto Peets is a resident of Bronx County in the City and State of New York.

12. Defendant City of New York ("City") is a municipal corporation organized under the laws of the State of New York. It operates the New York City Police Department ("NYPD"), which is an agency of defendant City responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

13. Defendant City, through the NYPD, is also responsible for developing, promulgating, and enforcing policies, procedures and customs that proximately caused the deprivations addressed herein, including those related to the collection, storage, preservation and testing of biological evidence.

14. The individual defendants at all times relevant herein, were officers, employees and agents of the NYPD. The individual defendants are sued in their individual capacities.

15. At all times relevant defendants John and Jane Doe 1 through 10 were police officers, detectives or supervisors employed by the NYPD. Plaintiff does not know the real names and shield numbers of defendants John and Jane Doe 1 through 10.

16. At all times relevant herein, defendants John and Jane Doe 1 through 10 were acting as agents, servants and employees of the City and NYPD. Defendants John and Jane Doe 1 through 10 are sued in their individual capacities.

17. At all times relevant herein, all individual defendants were acting under color of state law.

## THE CRIME

18. Shortly after 2:30 a.m. on September 29, 1996, a racially charged fight broke out between a group of African American men and a group of Hispanic men near the staircase leading to the 183rd Street/Jerome Avenue Subway station in the Bronx.

19. The fight started when one of the Hispanic men accused one of the African American men of having just stolen $20 from him inside a Kennedy Fried Chicken restaurant.

20. Around the same time, six African American men from Harlem were making their way home from a party in the Bronx when they encountered the fight (the "Harlem men").

21. At least one of the Harlem men was wearing a red jacket.

22. Travis Haynes, one of the Harlem men who had been in prison until 1995 on a felony gun charge and was on parole at the time, went toward the fight.



Travis Haynes

WARNING
I Don't Dial 911

Example of violent content from Haynes' Facebook Page

23. Another of the Harlem men, Randy Gourdine, followed Haynes and then heard gunshots and pulled Haynes away.

24. Gourdine and Haynes ducked behind cars before Haynes fled the scene with Bernard Radcliffe, another of the Harlem men.

25. During the incident, two Hispanic bystanders – who had not been inside the fried chicken restaurant – sustained lower-body gunshot wounds and a third Hispanic bystander was pistol-whipped. No African Americans were injured in the fight.

26. According to eyewitnesses including alleged robbery victim Humberto Acosta, the shooter was an African American man wearing a red jacket who was not part of the initial fight.



*Statement of robbery victim Humberto Acosta to NYPD (annotated)*

I was hanging -out infront of 1 W 184 St. There was a fight that started across the street . I think it was the chicken place. The guys that were fighting end up next to the Bar off the subway stairs. A couple of people broke-up the fight. Then, a guy wearing a red jacket showed up. And he shot the two guys that were fighting, earlier.

*Statement of eyewitness Carlos Taverez to NYPD (annotated)*

Upon arrival I interviewed Mr. Marcos Gomez M/H 46 DOB 04/05/50 of ████████ ████████. Mr. Gomez stated that he observed an altercation between two m/b and and one m/h . THe eyewitness observed one of the males with a base-ball bat but does not remember who had it. Mr. Gomez stated that two of the patrons from the Bar attempted to interveono behalf of the male hispanic when a thin m/b wearing a Red jkt and black pants armed with a handgun shot at the two males that came to assist the first male . Mr. Gomez stated that the victims were shot by this male . The eyewitness also states that at the time of this shooting

*Statement of eyewitness Marcos Gomez to NYPD (annotated)*

27. Defendants Staten and Fullam, uniformed patrol officers, arrived in a marked police vehicle as the shooting was underway.

28. Officer Staten pursued the shooter on foot while exchanging gunfire with him and another suspect, as the shooter fled up 183rd Street from Jerome Avenue towards Davidson Avenue.

29. Near the intersection of Evelyn Place and Davidson Avenue, a 9mm round fired from Staten's gun struck the shooter and the shooter fell to the ground, exclaiming "the cop shot me."

30. The shooter then stood up and fled the scene without being apprehended.

## THE INVESTIGATION

31. Following the shootout many NYPD officers responded, including defendants Lynott, Roman, Tegano, Oneschuck, Vigo, Rosato, Colon, Creegan, Milian, Dowling, Nealon, Gannon and Shanahan.

32. At defendant Lynott's direction, defendant Shanahan established a crime scene while defendant Tegano began collecting evidence.

33. Among the evidence recovered at the scene was a bloody 9mm bullet fragment found near the intersection of Evelyn Place and Davidson Avenue where the shooter had been struck by a bullet from Staten's gun and fallen.

34. In the vicinity of the bloody fragment, a baseball cap that matched defendants Staten and Fullam's description of the hat worn by the shooter was also recovered.

35. Composite sketches of the suspected perpetrators were ultimately prepared based on descriptions provided by the victims.

36. The sketches of the perpetrators strongly resemble the two Harlem men who had fled the scene.



Sketch of Perpetrator #1          Travis Haynes

Sketch of Perpetrator #2          Bernard Radcliffe

37. The Harlem men – with the exception of Haynes and Radcliffe, who had fled – were detained by Lynott and other defendants at the scene.

38. According to an affidavit provided by one of the Harlem men, Albert "Kenny" Niang, in 2021, Niang (who was wearing a red jacket) was positively identified by one of the victims as the shooter but Niang was inexplicably released without being questioned.

That the police arrived on the platform a short time later and placed my friends and me in handcuffs.

That the police took me downstairs to the street where two victims were being treated — one of whom had been shot, the other of whom had been pistol-whipped — and asked them if they recognized me. The victim who had been shot replied that I was not the shooter. The victim who had been pistol-whipped replied that I was the shooter.

. That despite having been identified by the victim who had been pistol-whipped as the shooter, I was let go by the police shortly thereafter. That the police mentioned the victim who had identified me was suffering from a head injury and they believed that he had mistakenly identified me.

*Affidavit of Albert "Kenny" Niang, 7/8/21 (excerpted)*

39. Defendants never disclosed the identification of Niang as the shooter and, indeed, defendant Sergeant Lynott affirmatively concealed it during his testimony at plaintiff's trial.

```
  7        Q    And to your knowledge was any of those six
  8   individuals who, some of whom closely resemble the
  9   defendant, identified by any of the witnesses in
 10   this case as the shooter?
 11        A    No.
```

*Trial testimony of Michael Lynott, 4/2/98*

40. Four of the Harlem men were taken to the 52nd Precinct, interviewed and released on the authority of defendant Lynott.

41. At the precinct, the Harlem men provided misleading written statements that masked the identity of their friends Travis Haynes and Bernard Radcliffe.

## A WEEK LATER, DEFENDANTS MISIDENTIFY AND ARREST PLAINTIFF

42. In the early morning hours of October 6, 1996, plaintiff Norberto Peets, who had no criminal record, was lawfully present in the vicinity of Grand Concourse in the Bronx.

43. Mr. Peets had been walking from a family party to his mother's house with his friend and a younger cousin when the three men stopped at a different Kennedy Fried Chicken location.

44. After the three men left the restaurant, defendants Erotokritou and Volpe detained them on an unfounded accusation that they had just attempted to rob the restaurant.

45. Operating under the false pretense that plaintiff and his companions matched the description of the suspects in the September 29th shootout, defendant Volpe summoned defendant defendant Fullam to the scene.

46. About a year earlier, defendant Fullam and plaintiff, along with defendant Staten, had spent hours together when Fullam and Staten handled a memorable incident in which plaintiff, who had recently endured emotional trauma, broke down and was hospitalized as an Emotionally Disturbed Person ("EDP").

47. When Fullam arrived at the scene on October 6, 1996, he claimed to immediately recognize plaintiff as the shooter from the September 29th incident.

48. However, Fullam was wrong and, if anything, recognized plaintiff from the lengthy incident the year before and not Fullam's fleeting glimpse of the shooter's face a week earlier, which Fullam characterized as lasting mere seconds.

49. Between the shootout on September 29th and plaintiff's misidentification by defendant Fullam on October 6th, neither Fullam nor Staten ever mentioned encountering the "shooter" in a prior EDP incident.

50. Indeed, even after plaintiff's arrest, when Fullam and Staten discussed the shared EDP incident, neither defendant disclosed it.

51. As the Chief of the Bronx County District Attorney's Conviction Integrity Bureau noted in a 2023 affidavit supporting plaintiff's 440 motion:

The jurors never heard about this alternative explanation for why Fullam immediately recognized Mr. Peets when he saw him in custody near the scene of the robbery and immediately identified him. Had the jurors been able to consider this evidence, as well as hear expert testimony about the unconscious transference, the verdict may well have been different.

52. Based on the initial misidentification, defendants Nealon, St. Clair and Voss placed plaintiff in suggestive lineups, leading plaintiff to be formally misidentified by Fullam and Staten as the shooter and booked on attempted murder charges related to the September 29th incident. Plaintiff's arrest was authorized by defendant Dowling.

53. While plaintiff was in defendant Nealon's custody, Nealon repeatedly threatened plaintiff, assaulted him and encouraged fellow officers to spit on and otherwise abuse plaintiff, telling his colleagues that plaintiff "likes to shoot at police."

## DEFENDANTS MISREPRESENT FACTS TO FRAME PLAINTIFF

54. In the official NYPD narrative of the events surrounding plaintiff's arrest, defendants replaced details from the alleged robbery on October 6th with elements from the September 29th shooting incident.



55. As discussed above, the September 29th shooting did not arise out of an attempted robbery but rather occurred when an uninvolved African American shooter intervened in a brawl between Hispanics and African Americans.

56. Defendants further distorted this fabricated narrative when they brought the case to the District Attorney.

57. In the story as fabricated by defendants and memorialized in the DA's intake notes, the three Hispanic victims in the September 29th incident – Messrs. Arroyo, Ramos and Diaz – are transformed from bystanders outside a nearby bar into patrons of the Kennedy Fried Chicken who were supposedly robbed by plaintiff and his companions, also Hispanic men.



*DA's intake notes (excerpted)*

58. In misrepresenting the facts of the September 29th incident, defendants concealed its racial dynamics (which tend to exonerate plaintiff) and omitted any mention of African American participants, despite their primacy in eyewitness accounts.

## DEFENDANTS CORRUPT THEN LOSE KEY BIOLOGICAL EVIDENCE

59. The blood on the bullet fragment that was recovered on September 29th could have readily exonerated Mr. Peets.

60. Serology testing could have established that the shooter had a different blood type.

61. And regardless of the shooter's blood type, DNA testing could have conclusively eliminated Mr. Peets as a suspect.

62. But no such testing was ever performed on this evidence, nor could it be.

63. This is because defendant Tegano marked the bloody bullet fragment for serology testing but defendants inexplicably never sent it to the laboratory.

64. Thereafter, defendant Tota, an NYPD analyst, bleached the blood from the bullet fragment, destroying it.

65. Defendants then lost the fragment and the envelope in which it had been contained.

## PLAINTIFF IS WRONGFULLY CONVICTED AND JAILED FOR 26 YEARS

66. Unable to post bail and having now been indicted and continuously incarcerated, Mr. Peets began the hearings in his first trial on March 18, 1998.

67. By April 6, 1998, the third day of trial, Mr. Peets, who at the time was 26 years old with two young children and facing a life sentence, was unable to bear the weight of the false accusations against him and suffered a mental breakdown in the courthouse, leading to a mistrial.

68. Following his breakdown, Mr. Peets was involuntarily sedated, overmedicated and committed to a psychiatric institution until he was ultimately able to demonstrate his sanity and return to the horrible conditions inside Rikers Island.

69. This period was particularly traumatic for Mr. Peets, who was isolated from his close-knit family and forced – in an overmedicated state – to confront the twin terrors of psychiatric commitment and the maddening prospect of spending life in prison as an innocent man.

70. The second trial did not commence until approximately a year later.

71. Plaintiff, who unlike the true perpetrator had never been shot, was then forced to stand trial by defendants who misidentified him and deprived him of forensic evidence to prove his innocence and key exonerating facts regarding, *inter alia*, alternate suspects, distorted and conflated narratives and the prior EDP incident.

72. Plaintiff was convicted of all charges and, on May 26, 1999, sentenced to thirty years to life.

## POST-CONVICTION INVESTIGATION EXONERATES PLAINTIFF

73. Decades after he was convicted and with all appeals denied, Mr. Peets' case was accepted by the Innocence Project and he moved to obtain post-conviction DNA testing of the blood from the bullet that struck the shooter.

74. Following extensive litigation, it was determined that the bullet fragment and the envelope that contained it had been lost by defendants and were unavailable for testing.

75. The Innocence Project on behalf of plaintiff then entered into an agreement with the Bronx County District Attorney's office to attempt to obtain and test DNA from the baseball cap that had been recovered and believed to belong to the shooter.

76. DNA taken from the hat was analyzed and, while a CODIS-eligible sample could not be developed, "wearer DNA" was obtained and analyzed.

77. DNA analysis eliminates Mr. Peets as a contributor to the wearer DNA from the baseball cap.

78. Additionally, the Innocence Project retained a qualified forensic examiner, Dr. Allen S. Keller, who conducted a clinical evaluation of Mr. Peets at Sing Sing and determined that he had never been shot.

79. The Innocence Project also retained Charles Linehan, who is currently the Chief of the Conviction Review Unit at the Kings County District Attorney's office and was then in private practice, to reinvestigate plaintiff's case.

80. Mr. Linehan found and interviewed the surviving Harlem men and uncovered evidence that defendants had suppressed the identification of Kenny Niang at the scene and failed to pursue alternate suspects.

81. Mr. Linehan concluded that plaintiff was innocent of the September 29th shooting and detailed his findings and analysis in a 19-page report.

82. The Conviction Integrity Bureau of the Bronx County District Attorney's Office ("CIB") conducted a parallel inquiry, which included interviewing defendants Staten and Fullam.

83. In the course of its investigation, CIB discovered the prior EDP incident and irregularities in the identification procedures, broadly concluding that the identifications used to convict plaintiff were unreliable.

84. The CIB also determined that defendants failed to investigate suspects and mishandled the biological evidence in plaintiff's case.

85. Plaintiff filed a motion to vacate his conviction pursuant to CPL § 440.10(1)(h) on September 16, 2022.

86. Plaintiff's conviction was vacated, and he was released from custody on September 30, 2022.

87. On May 9, 2023 – twenty-six years, seven months and twenty-five days after Mr. Peets was falsely accused – a Justice of the Bronx County Supreme Court dismissed plaintiff's indictment.

## PLAINTIFF'S INJURIES AND DAMAGES

88. Mr. Peets suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit. He was forced to suffer a mental breakdown and then endured the nightmare of involuntary sedation, overmedication, and psychiatric commitment. He was also denied effective treatment for his emotional injuries while incarcerated and continues to suffer mental anguish to this day. For example, plaintiff fears police contact and his everyday activities are limited and disrupted by the traumas he has suffered in this case. He was imprisoned when his father, grandmother and much of his close extended family passed away. He was not allowed to attend the funerals.

89. Plaintiff, who was a present and nurturing force in the lives of his infant children before his arrest, had no contact or relationship with them for decades following it, and will spend the rest of his life attempting to rebuild and strengthen his bonds with them.

90. Plaintiff was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, other family members and friends.

91. Plaintiff was also prevented from developing healthy romantic relationships.

92. Plaintiff was denied decades of gainful employment and income. His earning power and ability to support himself have been permanently hampered by the years of productive work experience his wrongful imprisonment denied him.

93. Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated. He was a figure of outrage and disdain as the convicted attempted murderer of police for events in which he had no part. Nothing can undo the damage he has sustained.

94. Additionally, Mr. Peets claims, *inter alia*, loss of liberty; loss of enjoyment of life; continuing pain and suffering, including post-incarceration psychological issues; post-incarceration mental health treatment costs; overmedication; involuntary commitment; lost earnings while incarcerated; impaired earning capacity and limitations on future employment opportunities; emotional distress; humiliation; indignities; embarrassment; degradation; physical injuries and lack of access to health care while incarcerated; attorneys' fees, and other pecuniary losses; and past pain and suffering.

## FIRST CLAIM
### Malicious Prosecution Under Federal and State Law

95. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

96. Defendants Staten, Fullam, Neelan, Lynott, Dowling and Creegan and unidentified defendants, acting deliberately and with malice, initiated and took steps to continue the criminal prosecution of Mr. Peets, without probable cause or other legal justification, by knowingly misidentifying plaintiff; withholding exculpatory evidence regarding, *inter alia*, the EDP incident; fabricating evidence regarding the circumstances of the crime; distorting the narrative of the events when presenting the case to the District Attorney; and failing to disclose their misconduct, in reckless disregard of evidence demonstrating Mr. Peets' innocence.

97. As described above, there was not even arguable probable cause to prosecute Mr. Peets, and no reasonable officer would have believed there was.

98. Plaintiff's indictment was procured by fraud, negating any presumption of probable cause. Defendants fabricated, suppressed and misrepresented material information presented to grand jurors regarding the identification of plaintiff as the shooter in bad faith, suppressing exculpatory evidence and corrupting the proceedings.

99. The prosecution ultimately terminated in Mr. Peets' favor – in a manner indicative of and predicated upon plaintiff's innocence – when, joined by the District Attorney's Office, his 440 motion was granted, the conviction was vacated and the indictment against him was dismissed.

100.     As a direct and proximate result of individual defendants' misconduct, Mr. Peets was wrongfully convicted and deprived of his liberty for nearly twenty-six years, among other damages.

## SECOND CLAIM
### Fabrication of Evidence, Due Process and *Brady* Violations

101.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

102.     Defendants Staten, Fullam, Nealon, Dowling, Volpe, Eritokritou, Oneschuck, Creegan, Vigo, Tegano, Lynott, Shanahan, Tota, Roman, St. Clair, Gannon, McTiernan, Milian, Rosato, Voss, Geary and Colon and unidentified defendants deliberately fabricated inculpatory evidence and suppressed exculpatory evidence.

103.     Mr. Peets was then wrongly convicted based on the fabricated evidence and without the benefit of the exculpatory information.

104.     Defendants failed to adequately disclose exculpatory information, in violation of their obligations under *Brady*, including the Niang identification, the EDP incident, the conflation of the narratives, the failure to pursue alternate suspects, and otherwise suppressed favorable evidence as described above.

105.     Defendants attempted to coerce plaintiff's cousin into providing false statements implicating plaintiff following plaintiff's arrest on October 6, 1996.

106.     Defendants destroyed and lost biological evidence that would have exonerated plaintiff.

107.     Defendants distorted the narrative of the events when presenting it to the District Attorney.

108.     Such fabrication and suppression of evidence violated Mr. Peets' clearly established rights to a fair trial and to not be deprived of liberty without due process of law, as well as *Brady v. Maryland*.

109.     This conduct violated the Fourth, Fifth, Sixth and Fourteenth Amendments.

110.     As a direct and proximate result of the individual defendants' fabrications, Mr. Peets was wrongfully convicted and suffered the injuries and damages described above.

## THIRD CLAIM
### *Monell*

111.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

112.    As of September 1996, the City of New York had a policy, practice and/or custom of failing to properly collect, handle, test and preserve biological evidence in cases handled by the NYPD.

113.    As a direct and proximate result of this policy, defendants never tested the crucial bloody bullet fragment for serological or DNA evidence that could have proven plaintiff's innocence, or preserved it for testing by plaintiff.

114.    Under the same defective municipal policies, defendants bleached the bloody bullet fragment and lost it and its envelope, which could have contained additional exculpatory material.

115.    This policy, practice and/or custom was executed in deliberate indifference to plaintiff's rights under the Fourth and Fourteenth Amendments.

116.    It was foreseeable to the City of New York that maintaining such a policy, practice and/or custom would result in constitutional violations of the type Mr. Peets suffered.

117.    This policy, practice and/or custom was the moving force behind plaintiff's constitutional deprivation and resulted in the damages alleged herein.

## FOURTH CLAIM
### Intentional or Negligent Infliction of Emotional Distress

118.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

119.     The deliberate conduct of defendants in fabricating and suppressing material information and causing plaintiff to suffer a wrongful conviction and damages described herein constitutes the intentional infliction of emotional distress.

120.     In the alternative, defendants' conduct constitutes negligent infliction of emotional distress.

## FIFTH CLAIM
### Negligence; Negligent Hiring/Training/Retention/Supervision

121.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

122.     Defendant City, through the NYPD, owed a duty of care to plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to plaintiff or to those in a like situation would probably result from the foregoing conduct.

123.     Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

124.    The individual defendants' conduct, including failing to pursue alternate suspects or properly handle biological evidence in this case was negligent, grossly negligent, reckless and intentional.

125.    Upon information and belief, defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants were potentially dangerous.

126.    Upon information and belief, defendant City's negligence in screening, hiring, training, disciplining, supervising and retaining these defendants and the individual defendants' own negligence proximately caused each of plaintiff's injuries.

127.    As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## SIXTH CLAIM
### Violation of Plaintiff's Administrative Code § 8-802 Rights

128.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

129.    The actions of defendants violated plaintiff's rights as defined in Section 8-802 of Chapter 8 of the New York City Administrative Code.

130.    As such, immunity is not a defense to the violations of plaintiff's rights and plaintiff demands and is entitled to the relief described in Section 8-805.

131.    As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
### Failure to Intervene

132.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

133.    Those defendants that were present for but did not actively participate in the aforementioned unlawful conduct were aware of such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

134.    As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

(d) All relief afforded under Section 8-805 of Chapter 8 of the New York City Administrative Code; and

(e) Such other and further relief as this Court deems just and proper.

Dated:      August 8, 2023
            New York, New York

                              ELEFTERAKIS, ELEFTERAKIS & PANEK

                              _____
                              Gabriel P. Harvis
                              Baree N. Fett
                              80 Pine Street, 38th Floor
                              New York, New York 10005
                              (212) 532-1116
                              gharvis@eeplaw.com

                              *Attorneys for plaintiff*